Good morning, Your Honors, and please support David Brower for the plaintiff. What we have before us today is a rather important issue in the securities area. The question here is the proper application of SEC Item 303. Prior to case law in this circuit, some of it going back several decades, involved cases in the context of what I would call garden variety projection cases where the projection turned out to be wrong, where there were specific numbers. Those cases were correctly decided by the circuit. 303 did not apply to those cases. And but recently in the Second Circuit in particular, 303 is now developed in the proper context where there is a known trend, risk, or uncertainty for which the defendants know if it comes to fruition, then that risk will have a material negative impact on the company. So there's this case in the Third Circuit, Oran, or Oran, that was written by a Judge Alito now, Justice, which held that 303 violation doesn't really have anything to do with making a case under 10b-5. And so is that case distinguishable, or are you saying we should split from that circuit? Well, I think we need to split from it because the regulation itself by the SEC was made part of the Exchange Act. And I have brought a copy of the actual regulation today. And part of the designation of the regulation is release number 34-26831. That references the 1934 Act. But the standard for a 10b-5 case is different than for item 303. The Second Circuit cases you cite, if I'm remembering them correctly, are not Section 10b-5 cases. They're 11 and 12, which say if you violate any of our requirements, then you have an action under 11 and 12. So that doesn't seem to be on point here. And aren't you, as a result, lowering your burden? I'm sorry. Aren't you, as a result, lowering your burden? No, Judge O'Connor. Let me try and answer both. It's O'Connell. O'Connell. I'm sorry. You've elevated me to a retired Supreme Court Justice. I'm glad I could be of help to you. Let me try and answer both questions. There is no such thing as a 10b-5 violation of 303. There is no such thing as a Section 11 violation of 303. The cases you're referring to, Blackstone and Panther Partners, I argued Blackstone. There was no alleged violation of 303 giving rise to a cause of action. What 303 does, it says it is one of the specific circumstances where a corporation must make a disclosure. It creates a duty to disclose. And, in fact, you rely on Simon, the District of Rhode Island case. But you don't mention Koffenbaum from the same court. Are you familiar with that case? I'm familiar with it. Okay. Talk to me about that case where the court clarified its position in Simon and said that item 303 doesn't provide a disclosure duty under 10b-5. Well, first of all, the Simon case on the facts here are more closely aligned. What happened in Simon, because I argued Simon. Okay. So you know the case. I'm pretty familiar with it. What happened in Simon was the problem that arose, the defect that arose with the American power converter instrument occurred after the close of the quarter. And instead of the – and then the quarterly report was issued 90 days later, which is permissible. And, of course, it made no mention of the problem that had arisen in between the time the quarter ended and the time the quarterly report was required to be filed. The defendants took this legalistic position and had no duty to disclose it. And what the court said was no. What the American power court said is no. You had a duty to disclose in a 10-Q, because 303 only applies to 10-Qs and 10-Ks. It's not some obligation to disclose whenever a problem occurs like an 8-K. You have a duty to disclose the known fact, then an uncertainty or trend, even though you didn't know at the time of the disclosure how much it would cost. And the accompaniment cost did not change that analysis. What's more is now you have two circuit decisions, very recent. You know, American power is a couple years old, as am I. You now have two circuit decisions, one dealing almost identical facts, Panther Partners, where the court said. It was a different cause of action. It was a cause of action under 11 and 12. It was under 11. But let me back up and answer that question. There is no difference with respect to whether a material piece of information is material for the purposes of 10b-5 or is material for the purposes of Section 11. There are no differences between the statute. Materiality. Well, isn't there a difference between 303 and 10b in materiality? Absolutely not. Because what 303 creates is a duty to disclose. It doesn't create or alter any of the elements of 10b-5, just like it doesn't create or alter any of the elements of Section 11. Is that the analysis? I thought the analysis that the Supreme Court tells us we apply to 10b-5 duties is that the duty arises only if the disclosure is necessary to make another statement not misleading. And I can see in the Simon case where if you're about to file a quarterly report, and you're going to make a statement that when filed you know is misleading because of something that happened after the close of the quarter, that there would be an obligation not to make a misleading statement 90 days later. But you're really asking us to say that 303 creates a duty in a 10b-5 to make a disclosure. That's correct, Your Honor. That's exactly what the SEC regulation says. So 11 and 12, according to Panther Partners, or Section 11, imposes strict liability. There's no scienter. And it's strict liability if there is a omission and contravention of an affirmative legal disclosure obligation. And the PLSRA heightened scienter requirement doesn't apply, as I understand. Is that correct? In Section 11, it does not. Yeah. So I guess I'm having to, I'm sort of struggling to see why Panther Partners is relevant to our situation, whereas ORAN seems to be directly on point. The difference, Your Honor, is simple. If there are statute, you have to do step-by-step through Section 10. Like Section 11, they both preclude making misrepresentations or omission of material fact that otherwise make statements made false and misleading. They then require that be a material piece of information. And there is no distinction between Sections 11 and 10b-5 with respect to what is a material misrepresentation. Then under Section 10b, the courts have held that there are several times there is a duty to disclose. Under 10b-5, those duties arise if you engage in insider trading, you either don't trade or you disclose. Another is there is a statutory or SEC regulatory requirement that you disclose something. That covers both 10b-5 and Section 11. Item 303 specifically covers Section 10 because otherwise quarterly reports and annual reports, which is what it says it applies to, would make no sense because there are no quarterly reports or annual reports when you have a Section 11 case. It's all based solely on the prospectus and registration statement. So the fact that the SEC made the regulation applicable to 10ks and 10qs, by definition meant they intended it to be applicable to the Exchange Act. Secondly, so I think that answers the question. Then the question becomes, has it lowered the standard? The answer is no, it hasn't lowered the standard. You would still have to show there was a known fact, that is, there was a known uncertainty, a known trend or a known demand for which the defendant reasonably believed would have a material adverse effect. That's where Judge Alito disagreed because he said in the commentary, it says if you don't know that there is a trend but you can't tell one way or the other, then you have to assume there's a trend and think about what would happen if the trend came to fruition. And so he relies on that, in part, to say this is not a 10b-5 violation. One problem with the warden is it dealt with a trend. This is a case that dealt with a known uncertainty. This is a situation where something arose, like in Panther Partners, something arose which the defendants knew if they were responsible for the problem, it would have a material adverse impact on the company. There's no question about that. And the issue under 303, and you're correct, Your Honor, that the guidance that controls the regulation makes it clear that if management is supposed to do an analysis, which they didn't do here, and there's no evidence they did the proper analysis under 303, and the district judge never touched upon the analysis and the interpretive guidance from the SEC. She doesn't mention it, she doesn't recite it, and she doesn't do the analysis himself. What you're supposed to do is take, in order to do the analysis, you should take the information that you know, the known risk. And there is no question here. The defendant knew about the problem before the class period began. It's not just you. Well, don't your declarations dispute that? The CW1's declarations contradict Demersion and Hoag. Don't they talk about it? There is a contradiction? No, there is no contradiction. Wait a minute. I'm sorry. Wait a minute. The question is whether or not it became known in 06 or later. Right. It doesn't matter. This class period here starts in November of 07. There is no dispute, including admission by the company itself in September of 08, that they had been working on this problem with their customers for more than a year. That would take you back to September of 07. CW1 says around 06 they must have known, but we don't really know the personal knowledge. Demersion's account says that HP didn't discover it until January of 07, and they had not really focused on it until mid-07. And then Hoag's declaration, excuse me, says 11-06. Right. Right? They resolved it. Right. And the class period here begins in November 07, when it's clear under all of these different kind of competing arguments of when they finally found out and when the company, NVIDIA, got involved, clearly knew. And all of the CWs say by mid-2007 they had replicated the problem using an NVIDIA chip, and they had gone to NVIDIA and showed them they replicated the problem using the NVIDIA chip. That takes you to exactly what Mr. Harris says, the head of corporate communications for NVIDIA, who said we've been working on this problem for more than a year when he made that statement September 08. So for the purpose of the class period, we picked a date for which there was no dispute that they knew, that the company knew about the problem. The company also knew at that point that Dell was complaining about the same problem, which the district court recognized, and it was more than one customer. It wasn't just HP. It was two of the largest laptop customers in the world. These are their two major customers for their most important product. Right, but HP, wait a minute, but HP, in resolving the issues, used new NVIDIA chips. So if they knew that the chips were the problem, they wouldn't have put the new chips in the motherboard because that would just continue to be the problem. So doesn't that provide circumstantial evidence that they didn't know what the root problem was? No, Your Honor. What they did is at the end of the class period, HP, at the end of the class period, NVIDIA announces, we have a new product. We've repaired the problem with the chip. We're not making the mistake we made with the bumps and all that stuff anymore. And they replaced the chips, and they paid the customer's warranty expenses. So the customers accepted that NVIDIA had fixed the chip and took the replacements. That doesn't mean you have a vendor who makes a mistake in a product, and they fix it, and they give you a new product that doesn't have the old problem. Why would you turn them down? Now, the danger to NVIDIA is – I think it's broken still. We don't know whether it's broken. Well, apparently they demonstrated to the customers it wasn't broken still, and they solved the problem by changing the design of the chip and solving the problem that was the interim problem because they had changed the design, so they changed it back. The issue is did they know a large number of their customers were complaining about the product, were blaming them for the product by the beginning of the class period? The answer is yes. And the district judge agreed with that, that they knew about the problem and the customers were complaining. The problem the district court found was we didn't show that the defendants knew how much it would cost. And there are a series of statements in the district court's opinion – I'm running out of time. I wanted to save a few minutes – the district court's opinion that said the problem is Mr. Huang didn't know how much. They didn't know it would be extraordinary. They didn't know it would be above the reserves. Three things. Nothing in 303 requires it to be extraordinary. It merely be a material adverse impact on the financial results. Second, by deciding it had to exceed the reserves, what the district court did is exactly what the court in Matrix rejected. It created a new bright-line test that for material adverse – it has to exceed reserves. Well, there's no rule in 303 and no basis for that rule that that should be the bright-line test any more than statistical significance should have been the rule in Matrix initiatives, which Judge Sotomayor threw out and said no, you look at the qualitative information, not the quantitative information. Finally, very clearly from each time the district court says they didn't know how much it would cost, falls into the interpretive release, which is if you don't know for sure that it won't have a material adverse impact, disclose. And that's within the policy of the federal securities laws, which is to, you know, in doubt, disclose. And they didn't have to say how much. We'll agree they didn't know how much. In fact, even when they came out with a number at the end of the class period, it was almost half wrong. It went from 150 to 200 million to a half a billion over the next year. They didn't know what the number was, but they had a duty to disclose that if this comes to fruition, then it will have a material adverse impact on our financial condition. And they knew that would be the case because unlike the district court, if you look at paragraph – sorry – 134 of the complaint, which is in the company's risk disclosures, and it's at page 266 of 322 in the appendix, the defendants disclosed if we have a product defect, and they go through a series of what would happen. If we have a product defect, to summarize the paragraph is this long, it will have a material adverse impact. And it could have a material adverse impact on our financial results. So they knew what this kind of problem, if it turned out to be their fault or if they had to satisfy their customers, Judge O'Connell, if they had to satisfy their customers who were blaming them whether they could prove it or not, it would have a material adverse impact on their financial condition. And the fact is at the end of the class period in July of 2008, when the company did disclose the problem and did at that time disclose an estimate of the number, you'll recall, Your Honor, they didn't take the blame for the problem. What they said is to make our customers happy, we're going to replace all the chips. And that was always the risk they faced once Dell and HP were blaming them for the overheating problems in their laptop, which was crossing all the borders. 303 does apply to Section 10B. I want to add one more thing. To the extent the district court said this thing about how did they know it would exceed the reserve, which doesn't matter, it's creating this new bright-line test, the kind of test that was rejected in Matros, if they knew it was going to exceed the reserve, they then would have had an affirmative duty to change the reserve under GAAP. So 303 would be meaningless. If a GAAP rule says once you know it's going to exceed a reserve, you have to increase the reserve, you would render 303 meaningless as a disclosure requirement. 303 is a qualitative disclosure requirement, not a quantitative disclosure requirement. It's to provide investors with information. What facts do you know? The facts they knew were two of our largest customers, the largest customers in the world for our product, our most important product, are blaming us for a defect in a large number of their laptops. And if it turns out to be our fault, then it will have a material adverse impact on our financial results. And by the way, just like you're required to disclose material litigation, you're only required, and that's a requirement as well, that's another one of the items. All you have to say is we have a litigation with X, this is what it's about, we don't know what the outcome will be, and nothing stops them from saying, because the rule doesn't require they do this, but every company does it in every public document, we think the case is without merit. We think we have meritorious defenses. If these defendants believe they could have made the proper disclosure under 303, we have complaints from a majority of our customers about a large number of chips that have been distributed and could have a material adverse impact on us if it turns out to be our responsibility. They could say, but we don't think. If they could honestly say it, which we don't think they could. Okay. Mr. Brower, you're four minutes over your time. Thank you. I guess I ate up my rebuttal time. I understand. Well, let's hear from the defendant. May it please the Court. Jim Kramer on behalf of the NVIDIA defendants. Your Honor, what I'd like to do is first I'm going to talk about why item 303 clearly doesn't apply here. We have Supreme Court precedent on point. And talk about even if it did apply, there were not facts alleged in the complaint to show that it would be triggered here. Then I want to talk about why there's otherwise no allegations to establish falsity. And finally talk about scienter. But I want to pick up on a point that Judge O'Connell raised earlier about the facts, because I think the facts are critical here. Counsel made a lot of claims about what's in the complaint. And we would urge the Court to carefully consider the facts that are actually alleged. And I want to take a moment and talk about what is in the complaint. And I'd be prepared to give specific sites if the Court needs them. But what we know with complaint is that there were a number of issues that were happening with NVIDIA chips during this period. And we also know that NVIDIA discloses that its chips fail all the time. There was a site to the complaint where there's a risk factor. But what counsel did cite you to is the company also takes a financial reserve every quarter. It tells its shareholders that in addition to our chips failing and having bugs in the past and that they may have bugs in the future, we take a financial reserve every quarter. And we cited to it in the record that there's actually on a quarter-by-quarter basis a financial charge the company takes. So the backdrop here is our chips may fail. They have in the past. They're failing now. And here's the financial impact of it. But if you look at what's in the complaint, it's quite interesting. Because the allegations of the complaint talk about three different things that are happening. And this comes from Mr. Hodge, Hunt Hodge, who's incorporated by reference into the complaint. And the district court took notice of that. And Mr. Hodge says there are three separate issues out there. The first is the one Judge O'Connell spoke about, which is the October-November ‑‑ I'm sorry. The first is the pressure issue that happens in September of 06. This is prototypes are being tested, and the pressure to test the chips have caused failures in prototypes. And as Mr. Hodge says, we caught them. Very few have made it out to the market. They were changed. That's what CW1 is speaking to, exactly the same time period. The second issue is the September of 07 issue. This is what Mr. Hodge calls a signal issue. This is a problem with the laptops that are causing some wireless interconnectivity. As Mr. Hodge tells us, we changed the BIOS, which is the software that controls the fan and how the computer operates, and it fixed it. The third problem, the one that we're here to talk about today, Mr. Hodge identifies as the heat cycling issue. And the heat cycling issue is what the reserve was taking to deal with. And the chronology is critically important to understanding was there a trend, was there a certainty. Putting aside the duty issue, I alluded to earlier the Supreme Court. The Supreme Court and Matrix dealt with the duty. There's no duty to disclose in this situation. I'll come back to that in a second, but I want to make sure we have the chronology in mind. Well, but Matrix is different. In Matrix, wasn't there a disclosure that was the opposite of ‑‑ That's correct. In Matrix, I thought that there was a disclosure that would have misled the investors. There was, but what the court was addressing there was when do you have a duty to speak? When do you have a duty to clarify information? And they said, look, issuers control what they say to the market. So if you choose to speak, you have to speak truthfully, meaning there's no obligation under 303. And I think, Judge O'Connell, you mentioned the Iran decision. In Iran, this is at page 288, the court goes through and says demonstration of a violation of the disclosure requirements of item 303 does not lead inevitably to the conclusion that such disclosure would be required under 10B. And then the court says such a duty to disclose must be separately shown. And that's Matrix. So if NVIDIA speaks, it has to speak truthfully. So here, what they've done is said our chips fail, we're going to take a reserve, and if the chips fail at a rate higher than our reserve, we're going to have a problem in our financial statements. What that means is for the plaintiffs to show falsity, they've got to allege that someone new at NVIDIA, Jensen, the only individual defendant new, at the time we're making the statements that this problem is our problem and that the problem is going to exceed our financial reserves. Now, clearly, if Judge Tolman's Dell laptop fails, he wouldn't just assume that it's an NVIDIA chip problem. It failed. There's 200 component parts in that computer. The problem with plaintiff's implicit theory is, oh, Dell HP laptops are failing. It must be NVIDIA's problem. Well, wait a minute. Mr. Hodge helps us with that. Mr. Hodge, who is identified, he was the senior person at HP having the discussions with NVIDIA. It's under oath, and it's in a separate proceeding where HP has no dog in our fight. This is not filtered through plaintiff's investigators. This is highly credible. Highly credible, and I think under Tell Labs should be given the appropriate weight. And what Mr. Hodge says is, we started seeing some failures in our notebooks, in some models, not all of them, and some in November of 2007. So what we did was we went ahead and grabbed a bunch of motherboards and started testing them, because we didn't know what the problem was. And in December, he says, and this is paragraphs 51 and 52, he says, let's issue a BIOS update. Let's go ahead and do what fixed our wireless problem before. Let's let the fan run. Maybe this will solve the problem. And then in January of 08, paragraph 53, they start testing. In March of 08, he says, paragraph 55, he says, we tested the NVIDIA chips for 87,000 hours of continuous use, and we didn't cause a single failure. That's in March of 08. We don't know what the problem is. We've run tests 87,000 hours. We don't know what the problem is. And then in May, they do some more testing. They say, aha, we've determined that when certain laptops with NVIDIA chips operate in a certain temperature range, the chips fail. So they go to NVIDIA, and they say, hey, NVIDIA, you know, we think now you're responsible. And what's NVIDIA do? It discloses it. NVIDIA discloses it, and it's May 22, 10Q. And what's it say? Well, and this is one of the issues we crossed a field on, because I think with all respect to Judge Seaborg, I think he got this one wrong. And this is SR145. And what NVIDIA says is, and I'm going to parse it slowly. He says, during the first quarter of 2009, one of our customers asserted claims for player replacement costs. True statement. First quarter of 2009, that was the cue that was filed. It goes on to say, this product was included in a significant number of this customer's notebook products and has also been shipped to other of our customers in significant quantities. True statement. It was shipped to HP, shipped to Dell and lots of other customers. It's out there in the market. Then they say, we're evaluating the scope of the situation, including the nature of the alleged defect and the merits of the customer's claim. And they go on to say, we're currently unable to estimate the amount of cost that may be incurred, and we've not taken a reserve. They're telling their market, the HP problem, the claim, that's out there with Dell. We don't know what the cause is, but it's out there. And you know what? If and when we determine what a reserve is, it might be big. If they want to come in and say, this is false, they've got to show that there's a material omission. In order to show a material omission, they need facts to show that NVIDIA either had a claim from somebody else or NVIDIA knew at this moment, in May of 08, after HP's done all this testing, handed the chips back to NVIDIA and said, we think you're responsible. We knew, you know what? This is our problem. We're going to take a financial charge. And I challenged them. I challenged them to come up here and identify one person in the complaint that can speak to that. Because they can't. But they're saying that she delayed in the disclosure, that she knew that the chip was a problem, and that under 303, because there's this uncertainty, quote, unquote, trend, you had an obligation to disclose it and that you threw false fixes. I refer to that as the PhD issue. I think that's more precise. They're saying you delayed your disclosure. I'm not sure they're taking issue with what was disclosed in May. At least I didn't understand that. I thought they were saying that you delayed on purpose and that that was a violation. Fair enough, Judge O'Connell. I was focused on what's in the complaint, not what their counsel was saying. That's what their counsel is arguing. There's not a single confidential witness. There's not a single fact in the complaint that goes to that. And if you look at their confidential witnesses, and we did some of this in our briefing, but it's quite shocking. They've got 17 confidential witnesses. The only one who's alleged to have dealt with this problem is CW1. And the timing, as you pointed out, it's a different issue. There's nobody that says, I talked to Mr. Wong. There's no one that says NVIDIA knew. There's no facts alleged. There's nothing out there at all. I mean, I hear you, and I hear what they say. We look at the complaint, and this is obviously de novo review of the motion to dismiss, and it's just not in the complaint. So let me touch briefly on Siander, if I might. Please. I think the, you know, there is just, it's just not possible to allege Siander here. Just not possible. I'll come to Corops in a minute. I think the fact that plaintiffs revert to Corops speaks volumes about their inability to allege specific facts. The district court twice looked at the Siander allegations. I'm just going to touch on them briefly. Mr. Wong did sell some stock, but he was a net acquirer of shares during the period. And his trading pattern was such that he sold more shares in the three quarters prior to the class period than during. So clearly his sales were not unusual or suspicious in timing or amount. He had his sales that were made during the class period were done by 10B501 plan. All this is in the record. Happy to give you cites. We've cited it to our briefs. And also NVIDIA bought back $124 million worth of stock during the class period. The company bought it back. And the idea that the company ---- And Mr. Huang gained stock. Yes, ma'am. He was a net acquirer of stock during the class period. Yes, he did sell some, but he got more stock than he sold. Exactly right. So the trading doesn't get you there in any way, shape, or form. I want to ask you a question about Oron. And counsel said that there's no difference in the materiality standards between 303 and 10B. Do you agree with that? You know, I actually think that that's possible. I hadn't thought through it. To me, I think the issue is not materiality. It's duty. Is there a duty to speak? And 303 is a materiality and duty under the 33 Act. But remember, it's a 10B-5 case. No case since Matrix, no circuit court since Matrix has held that 303 is a duty under 10B. It hasn't been done. Well, Justice Alito actually writes the opposite. Because materiality is different. If so facto, a failure under 303 does not mean a failure under 10B-5. Again, I hadn't spent a lot of time on it. To me, I think of it as a duty. I think of it as, because under Matrix, the Supreme Court says you don't have any obligation to disclose material things otherwise as required by, you know, the law. And if you choose to speak, you have to speak truthfully. So NVIDIA, while there might be an obligation under the SEC rules and might give the SEC the ability to pursue NVIDIA if they don't have fair disclosures, the implied right under 10B is pretty clear and Matrix is pretty clear. Unless there's a duty, you don't have to go out there. You don't have to speak. And it's interesting, again, we could debate the duty issue. I think it's absolutely clear 303 does not apply to a 10B case. It hasn't happened since Matrix. It's improper. But more importantly, just quickly, Stekman, the Hart Brewing Company, tells you what you have to do to show, to meet the requirements of 303. And there's three. You have to have knowledge of an adverse trend. You have to acknowledge of a material impact caused by the trend. And finally, based on known facts, you have to reasonably expect that that's going to, the material impact is going to occur. And as Stekman says, this reasonably expects language is designed to deal with a situation where you're separating out a 303 disclosure from a forward-looking predictive statement. And that's right there, you know, at page 1293. And the court says, we don't want people to have to predict. Okay. So here, what happened? The argument is, well, chips are failing. That doesn't get you there. You have to show chips are failing and we knew we were responsible. No facts. I think you have to show chips failing, we're responsible by our fault, and our reserve isn't sufficient. If plaintiff's implicit argument is right, then any kind of chips fail, what do we do? Say, well, we disclosed to you that our chips fail. We disclosed to you they might continue to fail. And we've taken a financial reserve. So what more are they to do? They are failing. We're going to emphasize they're failing. NVIDIA's shareholders know they fail all the time because they take a reserve. NVIDIA shareholders know that if they fail above the reserve, there's going to be a problem. And NVIDIA's disclosures are accurate in that regard. So they don't have facts to meet the requirements of 303, even if it did apply. And quite frankly, I don't think it does. So I know they have more time. I really invite them to come up and show us where in the complaint they have facts that trigger 303. I mean, the legal analysis on 303 is what it is. But where are the allegations that get them there? And even if they get there on falsity, which they can't, where are the allegations that get them there on Santa? I have one minute left. Let me just talk about COROPS. As the Court knows, COROPS is rarely applied. It's an effort to circumvent the crisp and clear pleading requirements of the Reform Act. And the only situations where they have been applied is when the facts of falsity are absolutely clear and apparent in the pleading. If, Judge O'Connor, you said NVIDIA didn't say our chips never fail, if we had said our chips never fail, and at the same time we were getting complaints from HP, that would move you closer. But that's not the record here. The failure mechanism here by HP, remember, HP has a customer relationship. Right? They have a relationship with us and they have a relationship with the end user. HP's own declaration, the senior person HP is in charge says we didn't figure it out until May. And then we went to NVIDIA and then NVIDIA disclosed it, undisputed. If HP doesn't know until May, that is our fault. Even if we disagree with that, how could we possibly have acted with Sienta prior to that? This is not one of those cases where the falsity is so clear that COROPS can apply. And just finally on Collective Sienta, never been applied in my circuit. Again, no facts here. I see my time is up. I let Mr. Brower go over, so I'll give you a couple of minutes. Okay. Your Honor, I've completed. While I've enjoyed my time, I'm happy to answer any questions you have. But I've gone through the points I wanted to make. Okay. And unless the panel has any others, then I'll release you from the podium. Thank you very much, Your Honor. I appreciate it. Thank you. Sure, I'll give you two minutes. Judge O'Connell, Orrin did not survive Matrix. It's almost the same exact fact pattern involving almost the same exact product. It was a drug. It had to do with the same kind of anecdotal reports that come in from doctors in the field. Both dealt with the same sort of thing. Matrix said, wrong. Okay. You've got a duty to disclose. Take up the challenge. Take up the challenge. Yeah. I'm not sure what the challenge is. What evidence have you got that you can cite to us? I'm sorry? What evidence do you have to cite to us for C-Enter in the complaint? The evidence is district court found they knew about the problem. She found that at least by May they knew about the problem. They knew they were being blamed for the problem. They knew the kind of problem that was involved. The problem is that we have a disclosure in May. So what evidence do you have that's alleged in the complaint that the management of the company knew sufficient to trigger the 303 obligation? What we have are 17 CWs. You have people from HP who worked on the problem saying they were communicating. But, Mr. Barry, you only have one, and that goes back to 2006, who can say that I actually spoke with Mr. Jensen or Mr. Wang or somebody in upper management who would be the ones who are signing these disclosures. Public documents. Yeah. First of all, you have Mr. Harrop saying they were working on the problem. They were working on the problem for over a year, saying it in September of 2008. Just do the math. That comes to exactly when our CWs say they were telling them about the problem, which is in August and September of 2007. So you have the company admitting it after the class period that that was the period in which they knew about the problem and had been working on it. If that's not good enough, if the admission from the company itself isn't good enough, I'm not sure what you would expect under the PSLRA other than a trial. With respect to needing a misrepresentation, Matrix Involved did not involve 303. Matrix Involved affirmed its misrepresentation, but then omitted to state material facts, and Judge Sotomayor found they were false, as did the majority. I would submit that the company's risk disclosures themselves, which are in paragraphs 134, 136, and 138, which were 10Qs and 10Ks issued during the class period, all say, if we may have some problem with a chip, if we have problems with a chip, here are the terrible things that might happen. This is what we would have to do. For them to make that disclosure in the 10Qs and 10Ks without saying, and by the way, we have that problem right now, two of our biggest customers are claiming there is such a defect in our product, rendered the statements in their own risk disclosures materially false and misleading because investors had the right to know. It's not an if we have this problem or if customers are dissatisfied. Customers were dissatisfied, certainly by November of 2007 and May of 2008 and March of 2007 and 2008 when the annual report went out, which are the periods of these three public filings. Mr. Barr, you're about four minutes into the two minutes I gave you on rebuttal. I think we'll call it a day with that one. All right, thank you all. The cases are either submitted or we'll get to an answer as soon as we can. And we are adjourned for the day.
judges: O'connell, Tallman, Ikuta